# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| MALIBU MEDIA, LLC, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>PHAY LINTHAKHANH, )<br>)<br>    Defendants. )<br>_____ ) | Civil Case No. <u>3:12-cv-03211-SEM-BGC</u> |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO REQUIRE PLAINTIFF TO POST BOND FOR ATTORNEY FEES AND COSTS

**I.    INTRODUCTION**

Plaintiff respectfully requests the Court deny Defendant's Motion because Defendant is not likely to be the prevailing party, Defendant will suffer no prejudice, and requiring Plaintiff to post a bond will violate the purposes of the Copyright Act and Plaintiff's right to petition the Court.

Plaintiff Malibu Media is the creator of high end and popular adult content for its subscription website X-Art.com.  Malibu Media currently has tens of thousands of subscribers but faces a significant threat to its business because its movies are repeatedly stolen through the BitTorrent protocol.  Plaintiff knows that over 60,000 unique individuals illegally download its movies per month through the BitTorrent protocol, many of which reside in this district. Plaintiff has no other way to make the infringement stop and seek recourse for its losses than to bring a suit like the one before this Court and issue a Rule 45 subpoena to learn the Defendant's identity.  While some courts have criticized Plaintiff for the proliferation of its suits, Plaintiff's suits are only reflective of the mass infringement it suffers daily.  Here, a ruling requiring Plaintiff to post a bond for $62,000 before having the opportunity to litigate its case would

1

catastrophically undermine Plaintiff's right to sue for copyright infringement.  For these reasons, as more fully explained below, Plaintiff respectfully requests that the Court deny Defendant's motion.

## II.   FACTS

### A. Malibu Media's Enforcement Campaign

Colette Pelissier Field, with her husband Brigham Field, are the owners of Malibu Media and began their business from scratch.  Field Declaration at ¶ 3 (Exhibit A).  Ms. Field was a real estate agent and Mr. Field was a photographer.  *Id*. at ¶ 4.  When the real estate market started heading south, Ms. Field knew she and her husband needed to start a business together.  *Id*. at ¶ 5.  The Fields both felt that there was a lack of adult content that was beautiful and acceptable for women and couples.  *Id*. at ¶ 6.  The Fields wanted to create this type of content to satisfy what they hoped was an unfulfilled demand.  *Id*.  Their goal was to create erotica that is artistic and beautiful.  *Id*. at ¶ 7.  The Fields chose the name 'X-Art' to reflect their artistic aspirations, and began investing all of their available money and resources into the production of content – particularly erotic movies with high production value and a cinematic quality.  *Id.* at ¶ 8.

Their vision has become a huge success.  Currently, X-Art.com has tens of thousands of members.  *Id.* at ¶ 15.  Their customers pay a monthly subscription fee of $19.95 or an annual subscription fee of $99.95 to access their library of HD Video content.  *Id*. at ¶`12.  Internet subscription sales are and have always been by far X-Art's primary source of revenue.  *Id*. at ¶ 13.  The Fields invest millions of dollars a year producing content and running X-Art.com.  *Id*. at ¶ 14.  They have invested millions of dollars into their business in order to produce the best quality product.  *Id*. at ¶ 16.  For the first three years (when their site was not as popular) they did not have as many issues with piracy.  *Id.* at ¶ 15.  Now that their videos are highly desirable,

more people steal their videos than pay for a subscription. *Id*. Malibu Media has even started to receive many complaints from its members asking why they should pay to subscribe when Malibu Media's movies are available for free through BitTorrent. *Id*. at ¶ 16. Plaintiff Malibu Media has filed suit in this judicial District and in judicial districts across the country seeking to deter and stop the infringement. Malibu Media has no other choice.

Recently, popular men's magazine GQ did a feature on X-Art.[1] *See* Exhibit B. GQ did not hesitate to qualify X-Art's success as a company. "Investing in next-level cinematography - with a mantra to eschew porn tropes - the mom-and-pop American start-up has grown into a global production team, accessed by viewers in the hundreds of millions." *Id*. Indeed, the GQ article aptly describes the talent of Brigham Field, the emotional intelligence behind the X-Art videos, and the fact that the crew works incredibly hard, filming throughout the world with the most talented directors, to present the best videos possible. Malibu Media is a famous, successful, and extremely valuable company with significant assets.

B. <u>The Infringer</u>

Defendant has infringed 24 (twenty four) of Plaintiff's movies over the course of seven months. *See* Second Amended Complaint Exhibit A. Indeed, Defendant has illegally downloaded Plaintiff's movies consistently and habitually every single month for seven months straight. *Id*. Every single infringement date is within two weeks of Plaintiff's release of the movie. *Id*. By downloading each of these movies through the BitTorrent protocol, Defendant simultaneously distributes these movies to others, allowing other people to also steal Plaintiff's newly released movies. *See* Second Amended Complaint ¶ 11. On September 5, 2012, your Honor entered an order allowing Plaintiff to subpoena Defendant's Internet Service Provider to

---

[1] http://www.gq-magazine.co.uk/girls/articles/2013-03-13/brigham-colette-field-x-art-sex-scene (Exhibit B)

3

receive Defendant's identity.  *See* CM/ECF 5.  Defendant's last date of infringement, after seven straight months, was on September 6, 2012.  *See* Second Amended Complaint Exhibit A.

After receiving Defendant's identity, but before naming and serving him with the Complaint, Plaintiff spoke with Defendant and Defendant's counsel.  Plaintiff learned that Defendant is a Senior Network Analyst and works out of his home office.

Plaintiff's investigator monitors a wide variety of BitTorrent traffic.  Before serving Defendant with the Complaint, Plaintiff asked its investigator to search through its database for other infringing conduct that may help determine whether the infringer is the subscriber.  Plaintiff's investigator returned a long list of BitTorrent activity by Defendant.  *See* Exhibit C.  This activity demonstrates that Defendant is a habitual BitTorrent thief.  *Id.*  Further, this activity helped Plaintiff determine that Defendant is, in fact, the infringer.  Indeed, at the time Plaintiff requested the information, Defendant's LinkedIn profile contained information on Defendant's area of network expertise.[2]  *See* Exhibit D.  Plaintiff compared Defendant's skill set on LinkedIn with the software which Defendant downloaded through BitTorrent and saw that there were specific correlations.  For example, Defendant lists "SolarWinds" as one of the technologies he has used in his work experience as a Network engineer.  *Id*.  Plaintiff's investigator recorded Defendant's IP address downloading through BitTorrent "SolarWinds Engineer's Toolset v9.2.zip" on August 15, 2012.  Given that Defendant uses SolarWinds in his profession and his IP address was downloading a SolarWind's engineer toolset, it is extremely likely Defendant was the one using BitTorrent through his IP address.

---

[2] At the current time, Defendant has removed any information from his LinkedIn profile other than basic information regarding location, work and education.  *See* http://www.linkedin.com/pub/phay-linthakhanh/7/912/b52
Plaintiff, however, used the Way Back Machine located at http://archive.org/web/web.php which archives web pages to locate Defendant's profile from earlier in the year.

### III. LEGAL ARGUMENT

#### A. Legal Standard

"No statute or rule, or decision of this circuit, expressly authorizes a court to require the posting of a bond to secure the payment of costs to a party should he prevail in the case." *Anderson v. Steers, Sullivan, McNamar & Rogers*, 998 F.2d 495, 496 (7th Cir. 1993). "A court may require a bond where 'there is reason to believe that the prevailing party will find it difficult to collect its costs' when the litigation ends." *Gay v. Chandra*, 682 F.3d 590, 594 (7th Cir. 2012).

Factors to be considered when requiring a bond are the "(1) the merits of the case, (2) the prejudice to the defendant of not requiring a bond, and (3) the prejudice to the plaintiff of requiring a bond." *Id.* citing *Aggarwal v. Ponce School of Medicine,* 745 F.2d 723, 727–28 (1st Cir.1984). "[C]are must be taken not to deprive a plaintiff of access to the federal courts." *Id.* at 594-595 citing *Simulnet E. Associates v. Ramada Hotel Operating Co.*, 37 F.3d 573, 575 (9th Cir. 1994). "When suit is brought under a federal statute, state provisions requiring security for costs or expenses clearly are inapplicable." § 2671 Security for Costs, 10 Fed. Prac. & Proc. Civ. § 2671 (3d ed.) "[A] federal court's discretion to require security for costs should not be exercised in a manner that interferes with the policy of the underlying federal statute." *Id.*

#### B. The Merits of the Case Weigh in Favor of Plaintiff

Plaintiff caught Defendant stealing 24 of its movies over seven months. Plaintiff has an undisputable right to sue Defendant for copyright infringement. Indeed, if Plaintiff had not brought this suit, Plaintiff has no doubt the infringement would have continued. This is evidenced by the fact that the infringement did not stop until Defendant received his notice from Comcast that he was being sued for copyright infringement. In the suit before this Court,

Plaintiff's claims are not for a singular act but brought against a habitual infringer. The merits of this case weigh in favor of Plaintiff bringing its claims.

### 1. The Facts Make Defendant's Declaration Not Credible

The facts in this case overwhelmingly demonstrate that Defendant is guilty of copyright infringement. Defendant's IP address was used to download Plaintiff's new movies through BitTorrent for a period of seven months. Once Defendant received notice of this lawsuit, the infringement stopped. Defendant is a Senior Network Analyst and his LinkedIn profile demonstrates that he has years of experience working in the computer network security field. Defendant works from home and currently "installs and configures Cisco Routers". *See* Exhibit D. Defendant's IP address was used through BitTorrent to download a network tool kit of a type of technology he lists as an expert. *See* Exhibit C and D.

Although Defendant claims he has never used BitTorrent and has never allowed anyone in his household to use BitTorrent, he does not explain why the infringement stopped upon notice of this suit. Defendant claims he is likely to prevail because his own home network – the same one where he installs professional networks for a living – could have been compromised without his knowledge. He even claims that it could have even been corrupted by Malware software that downloaded the movies. See Def's Mot at 10. Defendant's denial and his defenses are simply not credible. If anyone's Internet was likely to be secured, and protected from malware, hackers, neighbors, or someone sitting in his driveway, it would be Defendant's. And even if, despite Defendant's skill set and years of experience, his network were to be compromised, surely over the course of seven months Defendant would have realized it. Further, if someone did somehow manage to "fake" Defendant's IP address, or perhaps install

such malware onto his computer, the likelihood that that person would download a toolkit for an IT specialty of Defendant's seems borderline impossible.

2. <u>Plaintiff's Technology is Reliable</u>

In addition to Defendant's claims that his Network may have been compromised, Defendant provides a list of other potential hypothetical defenses. Specifically, Defendant states that 1) Plaintiff does not account for false positive IP address; 2) Plaintiff's expert has not verified that the movie is viewable. Neither of these reasons should be a basis to force Plaintiff to pay $62,000 up front to litigate its claims. Indeed, in every case a defendant may assert defenses. That does not mean that a plaintiff must post a bond of the cost of trial in the event defendant prevails. If that were the case, litigation would be impeded everywhere.

Each of Defendant's arguments is frivolous and not likely to prevail. IPP's software established a direct TCP/IP connection with the John Doe Defendants' IP address. When a direct TCP/IP connection is established, it is impossible for an individual to hide, fake, mask, or spoof his or her IP address because that individual's computer directly connects with IPP's server. At trial, Plaintiff's investigator, Tobias Fieser, will testify to this fact. And, Plaintiff plans on submitting a report by independent experts that will verify that IPP's technology works.

Plaintiff's investigative technology also accounts for false positives. Indeed, Defendant's motion cites to a study that concludes the best approach to accurately identify IP addresses is to establish a direct connection with the infringing user and verify the contents received:

> A more thorough approach to detecting infringement in BitTorrent would be to adopt the stated industry practice for monitoring the Gnutella network: <u>in the case of suspected infringement, download data directly from the suspected user and</u>

<u>verify its contents.</u>  Because we have notified several enforcement agencies … we expect increasing use of direct downloads for verifying information.[3]

(Emphasis added.)  Plaintiff used this <u>exact</u> process to identify Defendant's IP address. Plaintiff's investigative service, IPP Limited, established a direct one to one connection with a computer using Defendant's internet service and received a piece of Plaintiff's copyrighted movie from that computer.  "A direct and continuous connection between the IPTRACKER-server and the uploader of the file is established and exists at least 10 seconds before, during and at least 10 seconds after the capture sequence i.e. during the whole download process."  (Dec. Tobias Feiser Ex. A. at *4.)  Plaintiff's investigator retains evidence of each connection with Defendant.

Further, as Defendant's study suggests, Plaintiff has taken additional safeguards for accuracy by verifying the content received from Defendant.[4]  Plaintiff has a human "in the loop" to provide a manual check of the identifying material.  As Plaintiff's investigator, Tobias Fieser, attests, "Our software analyzed each BitTorrent "piece" distributed by each IP address listed on Exhibit B and verified that reassembling the pieces using a specialized BitTorrent Client results in a fully playable digital motion picture."  (Dec. Tobias Fieser at ¶ 21.)  Plaintiff is absolutely certain that Defendant's IP address downloaded, controlled, and distributed Plaintiff's copyrighted work to its investigative service.  Defendant's study supports Plaintiff's findings.

Plaintiff's expert verified and testified to the fact that the movies download by Defendant were viewable.  "I viewed the Movie side-by-side with the digital media file identified by the

---

[3] Def.'s Mot. 9 citing Michael Piatek, Tadayoshi Kohno, & Arvind Krishnamurthy, *Challenges and Directions for Monitoring P2P File Sharing Networks – or – Why My Printer Received a DMCA Takedown Notice*, 3rd USENIX Workshop on Hot Topics in Security (HatSec '08), July 2008.
[4] Piatek at *6.

hash value set forth on Exhibit B and determined that the digital media file contained a movie that was identical, strikingly similar or substantially similar." Dec. of Tobias Fieser at *3. Defendant's argument that the movie may not have been viewable is frivolous because Defendant downloaded twenty four different movies over a long period of time. This argument may have been convincing in BitTorrent suits where only one infringement was alleged, but here, it's obvious that the movie was viewable because the infringer continued to illegally download new movies by Plaintiff after each new movie was released.

   C. **Defendant Will Not Be Prejudiced if the Court Denies His Motion**

    1. Plaintiff Has Significant Assets

Defendant will not be prejudiced by a denial of his motion because, in the highly unlikely event he is found not to be guilty, Plaintiff has significant assets to pay for his costs and fees. As Plaintiff stated in its declaration, "Internet subscription sales are and have always been by far our primary source of revenue." Field Declaration ¶ 13. Plaintiff is a hugely successful multimillion dollar company. Plaintiff's office is not large because a large office is not required to run a successful online subscription website. Plaintiff's movies are filmed throughout the world in beautiful and exotic locations. Its producers, models, directors, and artists are highly regarded in their field and each year Plaintiff invests millions of dollars into its intellectual property. Indeed, Plaintiff has tens of thousands of subscribers pay it a subscription fee every month. GQ magazine, speaking of only one of Plaintiff's films released in the last year, noted: "With 2012's *Farewell*, they released their most filmic production yet: narrative driven, with budget and nuance unprecedented in the industry." *See* Exhibit B.

  Defendant points to the number of suits Plaintiff has brought throughout the country. But what Defendant does not mention is the fact that Plaintiff – not once – has ever failed to pay costs involved in litigation. Further, Plaintiff's claims have never been dismissed on a Motion to

Dismiss. Nor has a court ever entered Rule 11 sanctions against Plaintiff for a frivolous claim. Simply put, Plaintiff has never brought a claim that lacked merit or was in bad faith. Plaintiff should not be punished now because it has brought multiple suits if each suit has merit. Indeed, Plaintiff is the victim of mass intellectual property theft. Plaintiff must bring multiple suits to deter infringement. Defendant's fear that Plaintiff will not be able to pay fees in the unlikely event they are awarded is without basis.

2. <u>Attorney's Fees Under the Copyright Act are Discretionary</u>

Even if Defendant were to prevail in this case, attorney's fees under the Copyright Act are discretionary. "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Factors in considering whether to award attorney's fees under the Copyright Act include: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance consideration of compensation and deterrence." *Gonzales v. Transfer Technologies, Inc.*, 301 F.3d 608, 609 (7th Cir. 2002).

In this case, Plaintiff's claims against Defendant's are reasonable, particularly given the number of infringements and long time period which the infringement occurred. This is coupled with the fact that Defendant is not simply harming Plaintiff by downloading the individual movies, but in the process of downloading, is helping make them available to others so that others can download the illegal movies. Plaintiff has no other option to make the infringement stop than to sue Defendant, and no other way to identify Defendant than through an IP address. And in this case, the consideration of deterrence is significant, particularly given that deterrence

was effective. Indeed, simply by filing the suit, infringement that took place over course of seven months ceased. Given these equities, in the unlikely event Defendant were to prevail, attorney's fees may not be justified.

Defendant cites to two cases to support his position that fees are appropriate for a bond. *See* Def's Motion at 5 citing *Selletti v. Carey*, 173 F.R.D. 96, 101 (S.D.N.Y. 1997) and *Beverly Hills Design Studio*, 126 F.R.D. at 36, 39 (S.D.N.Y. 1989). Each of these cases is inapplicable because in both cases the court found that the plaintiff's cases appeared meritless or questionable on their face. "Where 'the merits of plaintiff's case [are] questionable,' security bonds are considered appropriate." *Selletti v. Carey*, 173 F.R.D. 96, 102 (S.D.N.Y. 1997) *aff'd,* 173 F.3d 104 (2d Cir. 1999). "[P]laintiffs' copyright infringement claim appears 'objectively without arguable merit.' Therefore, the defendants would likely recover attorneys' fees under Section 505. The security bond should thus include protection for attorneys' fees likely to be expended in defending against the copyright claim." *Beverly Hills Design Studio (N.Y.) Inc. v. Morris*, 126 F.R.D. 33, 38 (S.D.N.Y. 1989). Here, Plaintiff's claim is very strong and it's simply not likely, or even reasonable to conclude at this point that Defendant would recover attorney's fees.

    **D.**    <u>**Plaintiff Will Be Severely Prejudiced if the Court requires it to Post a Bond**</u>

        1. <u>Requiring Plaintiff to Post a Bond Impedes the Purpose of the Copyright Act and Plaintiff's Right Under the Petition Clause</u>

Malibu Media's goal is to successfully sue the most egregious infringers and at the same time establish a significant deterrent for those tempted to take its products for free. If it were forced to pay a potential award of attorney's fees up front for every infringer it brought suit against, it would not be capable of protecting its copyrights. It would simply be beyond its financial capabilities as a company.

In order for its litigation to have any deterrent effect, Plaintiff must sue enough people for

11

an individual to have a reasonable belief that if they break the law, they will be penalized. Plaintiff cannot do it if each lawsuit requires Plaintiff to post a bond for $62,000 dollars. The longstanding history of the Copyright Act demonstrates that Plaintiff's claims for copyright infringement are actionable. Indeed, Congress, the Supreme Court, the United States Copyright Office, several Circuit Courts, and the Executive Branch all have recognized the problem of online infringement. By requiring Plaintiff to post an exorbitant bond just to bring a claim for copyright infringement, Plaintiff will not be able to sue even the smallest fraction of infringers that regularly steal its content. This would nullify the Copyright Act which allows Plaintiff to bring this claim and violate Plaintiff's First Amendment right to petition the government.

1. <u>The Supreme Court and Circuit Courts Hold that Peer-to-Peer Distribution of Copyrighted Works Infringes Upon An Owner's Exclusive Right Under 17 U.S.C. §106</u>

The Supreme Court in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* 545 U.S. 913, 125 S.Ct. 2764 (2005), found that Grokster was liable for contributory infringement because it materially aided and induced its users to commit direct infringement via its peer-to-peer file sharing service. Similarly, the First, Second, Seventh, Eighth, Ninth and D.C. Circuits have all held that peer-to-peer infringement is actionable. *See Sony v. Tennenbaum,* 660 F.3d 487 (1st Cir. 2011) holding in a twenty-six (26) page opinion that Tennenbaum was liable for infringement committed through a peer-to-peer network, that peer-to-peer infringement is not "fair use" nor would any other defense shield Tennenbaum's tortious conduct, and that the statutory damages clause set forth in the Copyright Act is constitutional; *Arista Records, LLC. v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) denying an individual John Doe Defendant's motion to quash a subpoena issued to an internet service provider in response to an allegation that the John Doe Defendant infringed Arista's copyrights through a peer-to-peer file sharing network; *In re*

*Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003) upholding a preliminary injunction because Aimster was contributorily liable for its users' direct infringements; *In re Charter Communications, Inc. Subpoena Enforcement Matter*, 393 F.3d 771, 774 (8th Cir. 2005) opining that copyright owners have a right to identify peer-to-peer file sharers because those file sharers *are* infringing the owners' copyrights; *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001) "[w]e agree that the plaintiffs have shown that Napster users infringe at least two of the copyright holders' exclusive rights: the rights of reproduction, § 106(1); and distribution, § 106(3);" and *RIAA v. Verizon Internet Services, Inc.,* 351 F.3d 1229, 1238 (D.C. Cir. 2003) repetitively acknowledging that file sharing is infringement. Significantly, "District courts . . . agree . . . that downloading music from the internet, without paying for it or acquiring any rights to it, is a direct violation of the Copyright Act." *UMG Recording, Inc. v. Alburger*, 2009 WL 3152153, *3 (E.D. PA. 2009).

Both the Eighth and Second Circuits, the only circuits to rule on this issue, have approved the use of Rule 45 subpoenas in on-line infringement cases to identify anonymous Doe Defendants. The Eight Circuit held "organizations such as the RIAA can file a John Doe suit, along with a motion for third-party discovery of the identity of the otherwise anonymous 'John Doe' defendant." *In re Charter Communications, Inc., Subpoena Enforcement Matter*, 393 F.3d 771, FN3 (8th Cir. 2005). Similarly, in *Arista Records, LLC. v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) the Second Circuit upheld the District Court's denial of a motion to quash after Arista obtained leave "to serve a subpoena on defendants' common ISP, the State University of New York at Albany." By so holding, the Second Circuit approved the process of issuing a Rule 45 subpoena to an ISP to identify anonymous Doe Defendants.

2. <u>Congress Specifically Amended The Copyright Act to Deter Individuals From Committing On-Line Infringement</u>

In 1999 Congress intentionally amended the Copyright Act to deter individuals from infringing copyrights on the internet by increasing the statutory remedies:

> Congress did contemplate that suits like this [against individuals] were within the Act. Congress last amended the Copyright Act in 1999 <u>to increase the minimum and maximum awards</u> available under § 504(c). See Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106-160, 113 Stat. 1774. At the time, Congress specifically acknowledged that consumer-based, noncommercial use of copyrighted materials constituted actionable copyright infringement. Congress found that "copyright piracy of intellectual property flourishes, assisted in large part by today's world of advanced technologies," and cautioned that 'the potential for this problem to worsen is great.

*Sony v. Tennenbaum*, 2011 WL 4133920 at *11 (1st Cir. 2011) (emphasis added).

Congress anticipated the impact of infringement on the Internet and specifically considered the avenues for copyright holders to protect its copyrights. "The DMCA reflected a carefully balanced compromise between those who believed that ISPs should be exposed to potential liability for infringement occurring through use of their services, and those who believed such liability would stifle the growth of the Internet." *AF Holdings LLC v. Does 1-1,058*, 286 F.R.D. 39, 47 (D.D.C. 2012). "The DMCA resolved this legal and policy dispute by limiting the liability of ISPs for infringing activity occurring over their networks, while providing mechanisms for copyright owners to protect their copyrighted works with assistance from ISPs when specific evidence of infringing activity was identified." *Id*. "Senator Patrick Leahy, co-sponsor of the DMCA stated that Title II of the DMCA 'is intended to preserve incentives for online service providers and copyright owners to cooperate to detect and address copyright infringements that occur in the digital networked environment.'" *Id*. at 48 citing H.R.Rep. No. 105–796, Comm. on Conf., 72 (1998), 1998 U.S.C.C.A.N. 639, 649. "ISPs were

only shielded from monetary and injunctive liability in exchange for their assistance in identifying subscribers who engage in acts of piracy over their networks and in removing or disabling access of infringers to protected works when technically possible." *In re Charter Communications, Inc., Subpoena Enforcement Matter*, 393 F.3d 771, 782 (8th Cir. 2005).

By specifically amending the Copyright Act to deter on-line infringement, and constructing the DMCA in a way for ISPs and copyright holders to work together to identify infringers, Congress evinced a clear and unmistakable intent that actions against individuals who infringe copyrights on-line are permitted.

3. <u>The Former Register of Copyrights Testified In Front of the Senate That Movie Studios' Copyright Infringement Suits Are Proper</u>

During her time as Register of Copyright, Mary Beth Peters explained the rights of copyright holders in peer-to-peer infringement actions to the Senate Judiciary Committee. "The law is unambiguous. Using peer-to-peer networks to copy or distribute copyrighted works without permission is infringement and copyright owners have every right to invoke the power of the courts to combat such activity. Every court that has addressed the issue has agreed that this activity is infringement." [5] Ms. Peters explained that plaintiffs have a right to bring suits against those that steal its copyrights and these suits are necessary to deter infringement:

> [F]or some users of peer-to-peer technology, even knowledge that what they are doing is illegal will not be a sufficient disincentive to engage in such conduct. But whether or not these infringers know or care that it is against the law, the knowledge that such conduct may lead to expensive and burdensome litigation and a potentially large judgment should have a healthy deterrent effect. <u>While we would like to think that everyone obeys the law simply because it is the law and out of a sense of obligation, we also know that laws without penalties may be widely ignored</u>. For many people, the best form of education about copyright in the internet world is the

---

[5] *Pornography, Technology, and Process: Problems and Solutions on Peer-to-Peer Networks Statement of Marybeth Peters The Register of Copyrights before the Committee on the Judiciary* 108th Cong. (2003) *available at* http://www.copyright.gov/docs/regstat090903.html (Exhibit B)

threat of litigation. In short, if you break the law, you should be prepared to accept the consequences. <u>Copyright owners have every right to enforce their rights in court, whether they are taking action against providers of peer-to-peer services designed to profit from copyright infringement or against the persons engaging in individual acts of infringement using such services</u>.

<u>Id</u>. (Emphasis added). The rights the Register of Copyrights so eloquently champions depends on the use of Rule 45 subpoenas.

    4. <u>The Executive Branch, Congress, Federal Courts And Copyright Owners Are All Very Concerned With The Jobs And Money Lost From Online Piracy</u>

On June 22, 2010, Vice President Biden, speaking for the Executive Branch, said of on-line piracy "[t]his is theft, clear and simple."[6] "It's smash and grab, no different than a guy walking down Fifth Avenue and smashing the window at Tiffany's and reaching in and grabbing what's in the window." *Id.* "[O]n February 16, 2011, the Senate Judiciary Committee, led by Chairman Patrick Leahy (D-Vt.), held a hearing . . . about the growing problem of online infringement. . . ."[7] Leahy said "[t]he problem of online infringement is real; it is substantial; and it is a drain on our economy, which costs American jobs." *Id.* He continued "[c]opyright piracy and the sale of counterfeit goods are reported to cost the American economy billions of dollars annually and hundreds of thousands of lost jobs." *Id.*

The analogy made by Vice President Biden holds true here. This Court would not fault a retailer for prosecuting a shoplifter. Indeed, some retailers have a policy to prosecute all shoplifters[8]. This is because shoplifting has a direct impact on a retailer's ability to price its goods, and loss of merchandise raises prices, affecting each lawful consumer. Copyright infringement on the Internet also directly hurts lawful consumers. When individuals use the

---

[6] <u>See</u> http://www.reuters.com/article/2010/06/22/us-usa-trade-web-idUSTRE65L3YN20100622
[7] <u>See</u> http://www.techzone360.com/news/2011/02/16/5318701.htm.
[8] See e.g. Wal-Mart to Prosecute Younger Shoplifters http://www.cbsnews.com/2100-500395_162-3047721.html

Internet to steal large volumes of copyrighted content through BitTorrent, they use far more bandwidth than the average Internet user.  To compensate, Internet Service Providers raise the cost of Internet service to all customers, making all law abiding citizens pay more for Internet because of copyright infringement.

> 5. <u>Requiring Plaintiff to Post a Bond Effectively Leaves Plaintiff with a Right without a Remedy</u>

The only way to enforce one's copyrights against online infringement is to bring suits like the one currently before this Court.  Requiring copyright holders to pay a bond for each individual infringement impermissibly burdens Plaintiff because it cannot bring the petitions that need to be brought.  Here, Plaintiff would simply be unable to afford to sue even a handful of infringers per year.  Plaintiff would not be able to effectively deter infringement.  With out this ability, copyright owners would have a right without a remedy.  Any such state of affairs would violate Chief Justice Marshall's often cited rule that "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he received an injury."  <u>Marbury v. Madison</u>, 1 Cranch 137, 1803 WL 893, *17 (U.S. 1803).

**IV.    CONCLUSION**

For the foregoing reasons Plaintiff respectfully requests the Court deny Defendant's Motion that Plaintiff post a bond for attorney's fees and costs.

Dated:  April 11, 2013

Respectfully submitted,

NICOLETTI & ASSOCIATES, PLLC

By:   /s/ *Paul J. Nicoletti*
Paul J. Nicoletti, Esq. (P44419)
36880 Woodward Ave, Suite 100
Bloomfield Hills, MI 48304
Tel: (248) 203-7800
Fax: (248) 203-7801
E-Fax: (248) 928-7051
Email: paul@nicoletti-associates.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

By:   /s/ *Paul J. Nicoletti*